IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-75,406






RONNIE JOE NEAL, Appellant





v.



THE STATE OF TEXAS






ON DIRECT APPEAL

FROM CAUSE NO. 2005-CR-0698 IN THE 226TH DISTRICT COURT

BEXAR COUNTY




 Keller, P.J., delivered the opinion of the Court in which Womack, Keasler,
Hervey and Holcomb, JJ., joined. Meyers, J., filed a concurring opinion. Price, and
Johnson, JJ., concurred. Cochran, J., concurred in points of error 18, 24, and 25 and
otherwise joined the opinion of the Court.


O P I N I O N
A jury convicted appellant of capital murder. (1) Pursuant to the jury's answers to the special
issues set forth in Texas Code of Criminal Procedure, Article 37.071, §§ 2(b) and 2(e), the trial judge
sentenced him to death. (2) Direct appeal to this Court is automatic. (3) Appellant raises twenty-six
points of error. We find all of them to be without merit and therefore affirm. 

I. DETERMINATION OF MENTAL RETARDATION


Appellant's first three points of error concern the absence of legislation implementing
procedures consistent with the United States Supreme Court's holding in Atkins v. Virginia. (4) In
point of error one, appellant argues that Texas's death penalty scheme violates the Eighth and
Fourteenth Amendments to the United States Constitution given the absence of such legislation. 

The Supreme Court held in Atkins that the execution of a mentally retarded person violates
the Eighth Amendment's prohibition on "cruel and unusual punishment." (5) Recognizing that there
is "serious disagreement" in "determining which offenders are in fact retarded," the Court "[left] to
the States the task of developing appropriate ways to enforce the constitutional restriction upon its
execution of sentences." (6) In response to Atkins, this Court created temporary judicial guidelines for
trial courts in the absence of legislation. (7) We set forth a substantive test (detailed below under points
of error eight and nine) and procedural guidelines for trial courts to follow in determining whether
a defendant is mentally retarded for the purposes of an Atkins claim. (8) Over four years later, the
Texas legislature still has not enacted any legislation on this matter. 

Appellant argues that the use of judicial rather than statutory guidelines contravenes the
mandate of Atkins. The Supreme Court repeatedly stated, however, that it was "leav[ing] up to the
States" how to ensure that the death penalty not be imposed on mentally retarded defendants. (9) The
opinion never specified that this task must be performed exclusively by state legislatures rather than
any other state government entity. Atkins specified the end result to be achieved; it did not delineate
the mechanisms through which to achieve them, except that they are to occur at the state level. If
the Court had intended to direct only legislatures to act, then it could have easily referred to "the state
legislatures." Appellant's contention that the Supreme Court's references to "the States" actually
meant "the state legislatures" is untenable. 

Appellant argues that the Supreme Court itself, in Schriro v. Smith, reversed a Ninth Circuit
opinion instructing a trial court on how to comply with Atkins. (10) This argument misreads that case.
The Supreme Court did not say that the Ninth Circuit was a judicial body usurping a function
properly reserved to the legislature. Rather, the Court explained--in a short, per curiam
opinion--that the Ninth Circuit was a federal body usurping a function that the Atkins opinion had
plainly vested in "the States." (11) Schriro simply did not present any issue of whether a particular
ruling by a state court might be subject to constitutional challenge. (12)

Appellant maintains that the continued application of our guidelines violates the separation
of powers clause of the Texas Constitution, (13) relying largely on our statement in Briseño that "[t]his
Court does not, under normal circumstances, create law." (14) Yet we included that dictum precisely
because we faced not a "normal" situation but an extraordinary one. (15) The holding in Atkins had
compelled us, in the absence of any applicable legislation, to ensure that the procedures used in
Texas conform to the Supreme Court's interpretation of the Eighth Amendment. (16) Appellant does
not take issue with that decision, but maintains that the procedures are no longer valid because we
stated in Briseño that they would be merely "temporary judicial guidelines" during a "legislative
interregnum." (17) However, in the four years since we decided Briseño, nothing new has happened
to invalidate those guidelines. We remain in the same situation we were in the day we decided
Briseño: the legislature has not acted. The rationale set forth in that opinion thus continues to apply
to capital cases in which mental retardation is at issue. 

Unless legislative action is taken, the current guidelines remain in effect because there is no
adequate alternative that would ensure that our judicial system complies with the Supreme Court's
mandate. Appellant asks us to delay the administration of justice until some indeterminate point in
the future, but we must remember that, as we observed in Briseño, "justice delayed is justice
denied." (18) Indeed, if we were to satisfy appellant's request, we would not know if that point would
ever arrive, as it is impossible to know whether the legislature will ever take action. Appellant never
clarifies what he would like to happen if no legislation is ever enacted, but the logical extension of
his argument is that capital cases in which mental retardation is at issue would be relegated to a legal
no-man's land, unable to reach a final resolution. To avoid such a denial of justice, we uphold the
Briseño framework unless and until relevant legislation is enacted. Point of error one is overruled. 

In point of error two, appellant argues that the lack of statutory procedures for adjudicating
Atkins claims violates equal protection by subjecting different defendants to different trial
procedures. We have repeatedly held to the contrary. (19) Appellant draws an analogy to the county-to-county discrepancies among election procedures at issue in Bush v. Gore, (20) but we have rejected
precisely this analogy in previous cases. (21) Point of error two is overruled. 

In point of error three, appellant contends that the trial court erred in failing to abate the
proceedings until the legislature enacts statutory guidelines for determining mental retardation. This
point of error presupposes that the lack of such legislation violates appellant's constitutional rights. 
As we have already rejected appellant's claims to that effect, we reject this one as well. Point of
error three is overruled. 

In point of error six, appellant contends that the trial court erred in declining to empanel a
separate jury to determine whether appellant is mentally retarded. Appellant argues that the jury had
not been qualified at voir dire to determine the issue of mental retardation, but he forfeited this claim
by failing to question the jurors on mental retardation at voir dire. Appellant further argues that the
jury's determination was tainted because it had already found appellant guilty and was thus
predisposed to find that he was not mentally retarded. We have found no authority for the
proposition that mental retardation may not be determined by a jury that has already determined
guilt, and appellant cites none. Indeed, we have noted that the nature of the offense itself may be
relevant to a determination of mental retardation; (22) thus, a jury already familiar with the evidence
presented at the guilt stage might be especially well prepared to determine mental retardation. We
see no basis on which to impose on trial courts a requirement to empanel a separate jury to determine
whether a defendant is mentally retarded. Point of error six is overruled. 

In points of error eight and nine, appellant contends that the jury's determination that
appellant is not mentally retarded is against the great weight and preponderance of the evidence. For
the purposes of an Atkins claim, we have defined mental retardation as "1) significant sub-average
general intellectual functioning, usually evidenced by an IQ score below 70, that is accompanied by,
2) related limitations in adaptive functioning, 3) the onset of which occurs prior to the age of 18." (23) 
Factors relevant to evaluating the three prongs include: 

Did those who knew the person best during the developmental stage--his
family, friends, teachers, employers, authorities--think he was mentally retarded at
that time, and, if so, act in accordance with that determination?

Has the person formulated plans and carried them through or is his conduct
impulsive?

Does his conduct show leadership or does it show that he is led around by
others?

Is his conduct in response to external stimuli rational and appropriate,
regardless of whether it is socially acceptable?

Does he respond coherently, rationally, and on point to oral or written
questions or do his responses wander from subject to subject?

Can the person hide facts or lie effectively in his own or others' interests?

Putting aside any heinousness or gruesomeness surrounding the capital
offense, did the commission of that offense require forethought, planning, and
complex execution of purpose? (24)

When an affirmative defense of mental retardation is asserted at trial, the defendant bears the
burden to prove by a preponderance of the evidence that he is mentally retarded. (25) In reviewing the
sufficiency of the evidence to support a finding on mental retardation, we examine whether the
finding is "so against the great weight and preponderance of the evidence so as to be manifestly
unjust." (26) We give "great deference" to the findings below, as the fact finder is in the best position
to assess witnesses' credibility and resolve any conflicts in the evidence. (27) 

We turn now to the evidence pertaining to mental retardation. The defense presented two
experts, but we will review only the testimony of Dr. Richard Garnett because he was the only one
who testified specifically about appellant. Dr. Garnett testified that appellant had taken three IQ tests
before age 18. Neither the defense nor the State administered an IQ test in preparation for trial. At
age 11, appellant received an IQ score of 70. He received a score of 72 at age 15, and a score of 87
at age 17. 

Dr. Garnett testified that the scores are lower if one applies the "Flynn effect." We have
previously refrained from applying the Flynn effect, however, noting that it is an "unexamined
scientific concept" that does not provide a reliable basis for concluding that an appellant has
significant sub-average general intellectual functioning. (28) 

Dr. Garnett further noted appellant's problems in school, including learning difficulties and
failing the sixth grade. He also adjusted poorly to parole and was recommended for special
placement by juvenile probation officers at the Texas Youth Council. In addition, Dr. Garnett cited
various records and his own discussions with appellant's family and friends showing behavioral
problems, difficulty following rules, poor organizational and decision-making skills, a history of
getting into physical fights, and susceptibility to being manipulated or taken advantage of by others. 
Dr. Garnett further noted that these problems initially occurred before age 18. He concluded that
appellant satisfied all prongs for mental retardation. 

The State called four expert witnesses, all of whom concluded that appellant was not
mentally retarded. Dr. James Sherman based this finding on records from school, juvenile detention,
and other sources, as well as his own independent clinical evaluation. Based on his own testing of
appellant, he concluded that appellant tended to underperform on examinations, possibly due to
anxiety, depression, or simple lack of motivation. He testified that appellant understood the
consequences of his actions and had a history of gang involvement and substance abuse, including
alcohol, spray paint, marijuana, LSD, and cocaine. He further testified that appellant had a limited
fund of general knowledge but was oriented as to place and time. 

Dr. John Sparks received records from the State and also conducted an independent
examination to report on sanity, competence, and mental retardation. He found that appellant was
sane, competent, and not mentally retarded. Dr. Sparks testified that appellant had low intelligence
but was able to cooperate with people and give reasonable responses to questions. Like Dr.
Sherman, Dr. Sparks testified that appellant had a limited fund of general knowledge but was
oriented as to place and time. Appellant had one head injury but no "organic brain syndromes." 
Based on appellant's problems with anger and depression, Dr. Sparks would diagnose appellant as
having a "conduct disorder and antisocial personality."

Dr. Cesar Garcia had been appellant's doctor and testified based on his observations while
treating appellant. He testified that appellant is articulate and could write out an adequate grievance
statement. Appellant is organized, can navigate systems, and has "executive functioning skills." 
Finally, Dr. Garcia noted that appellant had devised an elaborate criminal escape plan. Based on
these observations, Dr. Garcia testified that appellant is not mentally retarded. 

Dr. Richard Coons examined various records related to appellant. He testified, in essence,
that appellant's major problems are personal rather than intellectual. Dr. Coons testified that
appellant is adaptive to society, fits in with the standards of his cultural group, is a capable worker,
and is able to accomplish tasks when he is motivated to do so. Dr. Coons had reviewed creative
writings by appellant and testified that he is "a prolific writer" and is competent at expressing his
thoughts. As an example, Dr. Coons read a poem by appellant in which he depicted himself as a lion
struggling to break free from the cage in which society had trapped him.

Dr. Coons echoed Dr. Sherman in stating that appellant's poor performance on IQ tests
seemed to result from extraneous problems such as anxiety, depression, or lack of motivation. Dr.
Coons also noted that the aforementioned Flynn effect is properly applied only to groups and not to
individuals. 

Appellant's mother testified that appellant had behavioral problems, school problems, a
possible head injury, and signs of depression. She referred to appellant's general "failure to thrive." 
She also testified that appellant had stolen things and dropped out of school. 

The State presented two inmates, who simply testified that appellant had boasted about
fabricating his own mental retardation defense. 

Appellant has failed to establish the onset before age 18 of either significant sub-average
general intellectual functioning or limitations in adaptive functioning. While there is much evidence
that he had struggled in coping with society throughout his life, his underlying problems seem
primarily behavior- and personality-related rather than related to low intellectual capacity. We will
not second-guess the fact-finder's assessment of the relative weight and credibility of the testimony
presented by the expert witnesses, four out of five of whom concluded, based on extensive research
and examinations, that appellant is not mentally retarded. Finally, his acts in abducting and killing
Ms. Tilly, as well as running a prostitution ring that included his own daughter, show that he was
capable of planning elaborate criminal ventures and attempting, albeit unsuccessfully, to conceal the
evidence. In light of the above facts, the evidence was sufficient to support the finding that
appellant had not met his burden to prove mental retardation. Points of error eight and nine are
overruled. 

II. SUFFICIENCY OF THE EVIDENCE


In point of error twelve, appellant contends that the evidence supporting his conviction is
factually insufficient due to insufficient evidence that he participated in the killing. In point of error
eleven, he argues that there is insufficient evidence corroborating Pearl Cruz's accomplice testimony.

In addressing a factual sufficiency claim, we review the evidence in a neutral light rather than
the light most favorable to the verdict. (29) Evidence is factually insufficient if the evidence supporting
the verdict is so weak that the verdict seems clearly wrong and manifestly unjust, or if the supporting
evidence is outweighed by the great weight and preponderance of the contrary evidence so as to
render the verdict clearly wrong and manifestly unjust. (30) We do not reverse for factual insufficiency
if the greater weight and preponderance of the evidence actually favors conviction. (31)

A conviction cannot be had upon the uncorroborated testimony of an accomplice witness. (32) 
Corroboration is not sufficient if it shows merely that the offense was committed. (33) 

We now turn to a review of the evidence based on the above principles. Appellant's
cellmate, Albert Mendiola, testified that appellant introduced himself by mentioning television
coverage of his case. Appellant then confessed to Mr. Mendiola: "I killed her." Appellant told Mr.
Mendiola that he entered the home of Diane Tilly, a local schoolteacher, and took a Rolex watch,
diamond ring, and gun from the home. He confessed that he raped her, using a condom "so there
wouldn't be no evidence." Finally, appellant provided Mr. Mendiola with a detailed account of
directing Ms. Tilly to walk into a "ranch road area." Once they had arrived at this area, Ms. Tilly
told him that he still had time to change his mind, but appellant responded that he was not going to
change his mind because she could turn him in if he released her. He then forced her to kneel down
and shot her four times. As he was reloading his gun, she said, "It burns, it burns," after which he
shot her one last time. Appellant told Mr. Mendiola that he was worried that Ms. Tilly's body might
be found, so he "covered her up with logs and brush." 

Throughout the events leading up to and following the rape and murder of Ms. Tilly,
appellant was accompanied by his 15-year-old daughter, Pearl Cruz, who provided detailed, lengthy
testimony at trial about these events. According to her testimony, she carried out her and her father's
plan by knocking on Ms. Tilly's door and falsely saying that she needed to use Ms. Tilly's phone
because her car had broken down. After Ms. Tilly let Cruz into her home, Cruz drew a gun, pointed
it at Ms. Tilly, and ordered her to "get down on the floor," "face down." Ms. Tilly complied, and
Cruz let appellant, who had been secretly waiting outside, into the house. 

Appellant used shoelaces to tie Ms. Tilly's hands behind her back. Appellant and Cruz then
found a gun and ATM card in the house. Appellant ordered Ms. Tilly to tell him her PIN so that he
could use the ATM card, and Ms. Tilly gave a number. Appellant then briefly left the house while
Cruz was still keeping Ms. Tilly there at gunpoint. Appellant returned and said that Ms. Tilly had
given the wrong number. Again, he ordered her to tell him her PIN, and she gave a different number. 
Appellant left the house a second time, and later returned with cash. 

Appellant then placed a sheet over Ms. Tilly's head and raped her. Cruz asked her father why
he was not using a condom; he told her that he had used one but that it had slipped off. Afterward,
appellant used peroxide on Ms. Tilly in an attempt to erase the evidence of his semen. 

Cruz testified that she then watched appellant pack various items from Ms. Tilly's house,
including a gold diamond ring and a Rolex watch, into her luggage. He put the items in Ms. Tilly's
car, and he put Ms. Tilly herself in the back seat, her head still covered. Appellant drove the three
of them in the car for about fifteen minutes, after which they got out of the car and walked into a
wooded area. 

Cruz went on to describe jumping over a barbed-wire fence with her father and then helping
him lift Ms. Tilly over the fence. Ms. Tilly asked what they were doing, but appellant told her to
keep quiet. Immediately thereafter, Appellant shot Ms. Tilly six times. As she was being shot to
death, Ms. Tilly cried out, "Oh, my God, it hurts, it burns. Bless this child." Appellant and Cruz
then crossed back over the fence, got into Ms. Tilly's car, and drove back to their motel room.

Later, while watching a missing person report on the television news about Ms. Tilly,
appellant became worried that they would be discovered. He and Cruz returned Ms. Tilly's car to
the same field in which they had killed her. Appellant poured gasoline over the car and set it on fire
in a failed attempt to destroy any evidence in the car.

Cruz testified that after she was arrested, she led the police to Ms. Tilly's body which she and
her father had covered up. She also described hiding the stolen credit cards in her underwear and
flushing them down the toilet while she was in police custody. 

Cruz's trial testimony conflicted with her earlier statement to the police, in which she did not
state that her father had raped Ms. Tilly or that she had asked if she could shoot Ms. Tilly. When
asked why she had omitted these points from her earlier statement, Cruz said that she "was ashamed"
when she first talked to the police. She further explained that she testified truthfully at trial to satisfy
a plea agreement with the State in exchange for a thirty-year cap on her punishment. 

An autopsy of Ms. Tilly revealed gunshot wounds in her right arm, back, and chest. The
bullets leaving these wounds had passed through her right lung and aorta, as well as bone and
muscle. Dr. Dimaio,  who conducted the autopsy, concluded that Ms. Tilly probably died within "a
few minutes" after being shot. Dr. DiMaio also testified that when Ms. Tilly's body was found, her
hands were tied behind her back with shoelaces, and her legs were bent at the knees.

Robert Sailors, a forensic scientist working in the Bexar County Criminal Investigation
Laboratory, testified about the results of a sexual assault evidence collection kit, in which he
obtained a vaginal swab from Ms. Tilly's body containing a microscopic amount of spermatozoa. 
By comparing the swab with a DNA sample collected from appellant, Dr. Sailors found that
appellant could not be excluded as the donor of DNA on the swab. Appellant's profile would be
seen in only one in 138 trillion African-Americans.

Officer Melvin Lleras testified that he had examined a fingerprint on a liquor bottle found
in Ms. Tilly's house and concluded that the print belonged to appellant. 

Appellant argues that appellant's confession to Mr. Mendiola was inadmissible. We reject
this argument, as we consider even inadmissible evidence when reviewing sufficiency of the
evidence. (34)

By his own stark admission and that of his accomplice, appellant raped and murdered the
victim. Cruz recounted all the relevant events in great detail at trial, from the conception of their
plan through its execution, as well as the aftermath in which she confessed to the police and led them
to Ms. Tilly's body. Appellant himself gave his cellmate a more general account of how he
committed the rape and murder. Taken together, the testimony of various witnesses--appellant,
Cruz, and police officers involved in the case--present a clear picture in which appellant abducted
Ms. Tilly, stole some of her valuable belongings, raped her, and fatally shot her several times in cold
blood. This testimony was additionally strengthened by the fingerprint and DNA evidence. While
there are some discrepancies among the various accounts of the events of that day, they are dwarfed
by the cohesive overall picture. The evidence was factually sufficient to support appellant's
conviction for capital murder. Moreover, Cruz's accomplice testimony was amply corroborated by
the other evidence of appellant's guilt. Points of error eleven and twelve are overruled. 

III. JURY INSTRUCTIONS


In points of error four and five, appellant contends that the trial court erred in failing to place
the burden on the State to prove beyond a reasonable doubt that appellant is not mentally retarded. 
We have held that the defendant bears the burden of proof to establish by a preponderance of the
evidence that he is mentally retarded. (35) Points of error four and five are overruled. 

In point of error seven, appellant contends that the trial court erred in failing to properly
instruct the jury as to the consideration of mental deficiencies other than mental retardation as
mitigating evidence. Appellant argues that the instruction given in this case is "somewhat similar"
to the one we held unconstitutional in Penry v. State. (36) In that case, the trial court instructed the jury
first to consider whether the appellant was mentally retarded and then to "consider whether any other
mitigating circumstance or circumstances exist." (37) This Court held that the instruction might have
confused the jury about whether it was allowed to consider evidence of mental deficiencies other
than mental retardation. (38) The instruction in this case, however, specifically instructed the jury to
consider "the mental impairment of the defendant that might not amount to mental retardation, if
any." 

Appellant further argues that the trial court's failure to mention a burden of proof in the
instruction might have confused the jurors because they might have assumed that the burden of proof
applicable to mental retardation also applies to other mental deficiencies. The defendant has the
burden to prove by a preponderance of the evidence that he is mentally retarded, but neither side
bears the burden of proof with respect to mitigation. (39) Although appellant claims that the trial court
was required to instruct the jury on the latter point, he concedes that an instruction that neither side
bears the burden of proof is generally not required. (40) Point of error seven is overruled. 

In point of error thirteen, appellant contends that the parties charge would have allowed the
jury to convict him of capital murder even if the jury had found that Cruz acted alone, without any
involvement by appellant. 

The jury instruction at issue stated: 

 To warrant a conviction of the defendant, Ronnie Joe Neal, of capital
murder, you must find from the evidence beyond a reasonable doubt
not only that Ronnie Joe Neal and/or Pearl Cruz, on the occasion in
question, was or were engaged in the commission of the felony
offenses of burglary, attempted burglary, kidnapping, attempted
kidnapping, robbery, attempted robbery, aggravated sexual assault, or
attempted aggravated sexual assault of the complainant, as defined in
these instructions, but also that during the commission of any one of
the offenses enumerated above, if any, the complainant was shot with
a firearm with the intent of killing the complainant. (41)


A conviction should be reversed for unobjected-to jury charge error only if it resulted in
"egregious harm." (42) Appellant concedes that no objection was made at trial, so the egregious harm
standard applies. Harm is egregious if it deprives the appellant of a "fair and impartial trial." (43) 

Even assuming arguendo that the jury instruction was erroneous in that it would have allowed
the jury to convict appellant even if the jurors believed that only Cruz engaged in the acts described
in the instruction, any such error would not have risen to the level of egregious harm. As explained
in the factual sufficiency analysis above, the evidence of appellant's guilt was overwhelming. 
Appellant does not even argue that a reasonable juror might have found that Cruz acted alone, and
there is nothing in the evidence to suggest as much. Point of error thirteen is overruled. 

In point of error twenty-six, appellant contends that the jury instructions given pursuant to
Article 37.071, §§ 2(d)(2) and 2(f)(1) were unconstitutional because they failed to inform the jury
that if it were hung eleven to one, appellant would be sentenced to life imprisonment. Appellant
concedes that we have previously rejected challenges to these sections (44) and does not attempt to
distinguish this case. We decline to overrule our precedents in this area. Point of error twenty-six
is overruled. 

IV. EVIDENTIARY ISSUES


In point of error ten, appellant contends that the trial court erred in allowing Dr. Coons to
testify as an expert witness. Appellant filed a motion requesting voir dire of expert witnesses. The
trial court granted the motion and allowed Dr. Coons to testify after conducting a hearing on his
qualifications. Appellant did not object to the admission of Dr. Coons's testimony based on
inadequate qualification. 

To preserve a complaint for appellate review, a specific and timely objection, motion, or
request must be made to the trial court. (45) The complaint is timely only if the party makes the
complaint "as soon as the grounds for it become apparent." (46) To be adequately specific, the
complaint must "let the trial judge know what he wants and why he is entitled to it." (47) In this case,
although appellant did request a hearing on expert qualification in the first place, he did not object
once the trial court had qualified Dr. Coons. Thus, he forfeited the right to challenge that ruling on
appeal. Point of error ten is overruled. 

In point of error fourteen, appellant contends that the testimony of Albert Mendiola violated
appellant's Sixth Amendment rights. As described in the factual sufficiency analysis above,
appellant introduced himself to Mr. Mendiola while the two were in the same holding cell by
initiating a conversation about killing Ms. Tilly. Later, Mr. Mendiola informed the government of
the conversation but insisted that he wanted no favors in return. According to Mr. Mendiola's
testimony, he did this purely to clear his own conscience. 

The government's acceptance of an informant's offer of information after the informant
receives the information does not convert the informant into a state agent. (48) Because he merely
informed the government of appellant's confession after it was made, Mr. Mendiola was not a state
agent. Moreover, even if Mr. Mendiola had been a state agent, no Sixth Amendment violation would
have occurred because Mr. Mendiola did not elicit any statements from appellant, but merely listened
to appellant's spontaneous confession. (49) Point of error fourteen is overruled. 

In points of error fifteen and sixteen, appellant claims that the State violated his right to due
process under the U.S. Constitution by losing or destroying Brady (50) materials of which appellant
requested disclosure. The Supreme Court has held that the government's "failure to preserve
potentially useful evidence" does not violate due process unless the defendant shows that the loss
of the evidence resulted from "bad faith on the part of the police." (51) Appellant presents no evidence
that the police acted in bad faith. Points of error fifteen and sixteen are overruled. 

In point of errors seventeen and nineteen, appellant contends that the trial court erred in
denying a motion to suppress all evidence seized as a result of his detention and arrest because
neither reasonable suspicion nor probable cause existed. A police officer may lawfully conduct a
temporary detention if there is reasonable suspicion to believe that the detained person is violating
the law. (52) Reasonable suspicion exists if the officer has specific articulable facts that, when
combined with rational inferences from those facts, would lead him to reasonably suspect that a
particular person has, or soon will be, engaged in criminal activity. (53) In making this determination,
we consider the totality of the circumstances. (54)

An arrest is valid under Texas law if the arresting officer had probable cause with respect to
the person being arrested as well as statutory authority to make the arrest. (55) If the officer does not
have a warrant, he still has statutory authority under Article 14.04 where it is shown by satisfactory
proof, "upon the representation of a credible person, that a felony has been committed, and that the
offender is about to escape, so that there is no time to procure a warrant." (56) For the purposes of this
test, the statutory requirement of "satisfactory proof" is equivalent to the constitutional requirement
of probable cause. (57) Probable cause exists if the officer knows of facts that would lead a reasonable
person to believe that the suspect has committed or will soon commit a crime. (58) In the context of
Article 14.04, "satisfactory proof" also goes to "escape," which is not necessarily a crime.

As with any suppression issue, we accord almost total deference to the trial court's
determination of the historical facts, especially if those determinations turn on witnesses' credibility
or demeanor. (59) When, as in this case, the trial court has not made specific findings of fact, we must
view the evidence in the light most favorable to the trial court's ruling. (60) We review de novo the trial
court's application of law to facts not turning on credibility or demeanor. (61)

Officers Miguel Gonzalez and Greg Blockley had received information about the possible
kidnapping of Ms. Tilly. They knew that her credit cards had been used at a particular area just off
the highway by a thin, black man about six feet tall and a black woman with a white Ford pickup
truck. The officers observed appellant at that same location and noticed that he satisfied the
description in that he was a tall, thin, black man. When they saw him, the truck's door was open and
the motor was running. While driving around the area, the officers made eye contact with appellant. 
Once appellant noticed the officers, he suddenly appeared very nervous. He walked away from the
vehicle while the motor was still running and the door was open. In so doing, appellant had left a
number of valuable items, such as computer equipment and luggage, in the truck and in plain view
to anyone who might have happened to be in the motel parking lot. The officers continued to
observe appellant walk from the parking lot to the motel building, and walk up and then down the
outdoor motel stairs. This whole time, the officers noticed that appellant was "closely" watching the
police car. The officers saw him communicating with a black female. Then the officers saw the
female approach the vehicle and stand by the passenger side.

The officers eventually stopped, exited their car, identified themselves as police officers to
appellant, and began asking him questions. Appellant initially answered the questions, telling the
officers that the vehicle was his and that he was staying in the motel. When Officer Gonzalez asked
appellant for some form of identification, however, he did not answer but instead started to run away. 
The officers immediately alerted dispatch of appellant's flight and ran after him, deliberately staying
a significant distance behind because they believed they had observed him reaching for a weapon
near his waistband. They eventually caught up to him and arrested him for fleeing the police. 

In light of these facts, the officers had reasonable suspicion to support detaining appellant
in the parking lot. Appellant asserts in his brief that the officers had observed no suspicious behavior
or evidence of criminal activity and "merely desired to identify" him. In fact, though, the evidence
reveals ample reason for the officers to have concluded that appellant had been engaged in criminal
activity. The location, appellant's general description, his contact with a black female, and his
vehicle all matched the description the officers had been given of the suspect in their missing-person
investigation. Appellant reacted to the police by acting nervous and leaving his truck unattended
while the engine was running, the door was open, and valuable items were inside. Taken together,
these facts provided the police with specific articulable facts that, when combined with reasonable
inferences from those facts, would lead a reasonable person to suspect that appellant had committed
the offense they were investigating.

Once appellant refused to identify himself and attempted to escape from the police while
appearing to reach for a weapon, the officers had further reason to suspect that he had committed
or was about to commit a crime. This attempt to escape compounded the above evidence that he had
committed a crime, providing satisfactory proof that he had committed a felony and was about to
escape--indeed, was already escaping-- so that there was no time to procure a warrant. Points of
error seventeen and nineteen are overruled. 

In point of error eighteen, appellant contends that the trial court erred in admitting evidence
seized from the warrantless search of his automobile. Evidence seized by the police without a
warrant may be admitted only if an exception to the Fourth Amendment's warrant requirement
applies. (62) A defendant challenging the admission of evidence on the basis of the Fourth Amendment
bears the initial burden to prove that the search occurred without a warrant. (63) If the defendant meets
this burden, the burden then shifts to the State to prove that an exception applies. (64)

One such exception holds that the police may lawfully search an automobile if they have
probable cause to believe that the vehicle contains evidence of a crime. (65) Probable cause to search
exists when there is a "fair probability" of finding inculpatory evidence at the location being
searched. (66) If this exception applies, then the police may search "every part of the vehicle and its
contents that may conceal the object of the search." (67)

The record shows the following facts relevant to this point of error: After appellant had fled
Officers Gonzalez and Blockley but before the arrest, Officer Gonzalez informed Officers Bill Day
and Sylvia Espino of the situation and led them to appellant's truck while Officer Blockley stayed
on lookout in the motel area. Officer Day testified that once he arrived at the scene, he searched the
truck and found numerous items, including luggage, jewelry, makeup, a laptop computer, a
lawnmower, tools, liquor bottles, appellant's pay stub, laundry detergent, and a bag of wet clothing. 
He lifted one of the luggage tags and saw that it was labeled, "Diane Tilly." Photographs of the
contents of the truck were admitted into evidence at trial.

We have already explained above that the police had probable cause to arrest appellant
because a reasonable person would believe he had likely committed a crime or would soon commit
a crime. The investigation itself was based on information leading the police to suspect that
appellant had kidnapped Ms. Tilly. The officers had reason to believe that the truck belonged to
appellant because they had observed him and the other suspect, Cruz, standing next to it, and because
the truck matched the description the officers had received. Taken together, these facts would have
caused a reasonable person to believe that the Ford was appellant's truck and that it would likely
have contained evidence of a crime committed against Ms. Tilly, such as weapons or her personal
belongings. While appellant may be correct in noting that it was physically impossible to read Ms.
Tilly's luggage tags without entering the car and turning them over, it is unsurprising, based on all
the information the police had at that point, that the luggage turned out to belong to her. We
conclude that the State has met its burden to show that officers had probable cause to search the
truck and that the warrantless search was thus valid under the automobile exception.

Appellant further argues that there was no concern that the evidence in the truck would be
destroyed or lost because appellant and Cruz were already in policy custody. The automobile
exception, however, does not require exigent circumstances. (68) Point of error eighteen is overruled.

In points of error twenty and twenty-one, appellant contends that the trial court erred in
admitting evidence seized from his motel room without a search warrant.

Having learned from the front desk of the motel that a black man and girl were staying in a
room on the second floor, Officers Bill Day and Sylvia Espino knocked on two doors of occupied
rooms on the second floor to try to find appellant's room. Cruz answered the door, and police
recognized her as the person with whom appellant had communicated in the parking lot. She
repeatedly yelled, "I'm a minor!" Cruz told the police that they could confirm that she was a minor
by asking her mother, with whom she claimed she was talking on the phone at the time. The police
immediately handcuffed her. Cruz told the officers that there was a handgun under a mattress in the
room and that ammunition cartridges were inside her boots. The officers retrieved these items from
those locations. The officers also retrieved from Cruz's purse appellant's identification card for
Blockbuster video rental store. 

The trial court admitted all of these items into evidence at trial. A ballistics expert who had
examined some of the spent cartridges from the scene of the murder testified that they had all been
fired from a gun other than the one found in the motel room. This evidence was supported by Cruz's
testimony that appellant insisted that they use Ms. Tilly's own gun to kill her, rather than the gun that
they would later leave under the mattress, because appellant believed that the latter gun would be
too easy for the authorities to trace. 

In addition, the prosecutor questioned Cruz about how she used the gun seized from the
motel room to hold up Ms. Tilly. The prosecutor handed the gun to her, and she indicated the
manner in which she had held the gun as she told Ms. Tilly to get down on the ground. 

The State argued at trial that exigent circumstances justified the entry of the room because
the police were investigating a report of a missing person. The State also contends on appeal that
the search was valid as a search incident to a lawful arrest. Appellant does not address either of these
arguments, but instead argues that the consent exception to the warrant requirement does not apply. 

The State further contends that any error in admitting the evidence was harmless. Appellant
does not address the question of harm. 

The police may search a defendant's residence without satisfying the Fourth Amendment's
general requirement of a warrant if they have exigent circumstances and probable cause to search
the residence. (69)

Assuming, without deciding, that the trial court erroneously admitted the items retrieved from
the hotel room, we will conduct a harm analysis. If we find, beyond a reasonable doubt, that a
constitutional error did not contribute to the verdict, then the error was harmless such that we will
not reverse the judgment. (70) To make this determination, we must "calculate, as nearly as possible,
the probable impact of the error on the jury in light of the other evidence." (71) The error was not
harmless if there is a reasonable likelihood that it materially affected the jury's deliberations. (72)

Our review of the record shows that in briefly examining Cruz about how she used the gun,
the State was adding one more vivid detail to the much larger story of the events surrounding the
murder. Seeing appellant's accomplice actually handle the weapon and mimic her own past actions
may have added a dramatic flourish at trial, but was not essential to the State's case. The ballistics
expert specifically ruled out the gun as the murder weapon. The Blockbuster card was of little
significance . In light of the other overwhelming evidence, we find, beyond a reasonable doubt, that
the evidence seized from the motel room did not contribute to the verdict. Points of error twenty and
twenty-one are overruled.

In point of error twenty-two, appellant contends that the trial court erred in admitting Cruz's
confession because it was obtained in violation of due process. In point of error twenty-three,
appellant contends that the trial court erred in failing to submit an Article 38.23 charge to the jury
on the confession. A defendant has no standing to raise a constitutional challenge to another
person's confession. (73) The same rule applies in the context of Article 38.23. (74) Appellant lacks
standing to raise either a constitutional challenge or a statutory challenge to the legality of Cruz's
statement. And lacking standing, he was not entitled to an Article 38.23 instruction regarding the
confession. Points of error twenty-two and twenty-three are overruled.

In points of error twenty-four and twenty-five, appellant contends that the trial court erred
in admitting surveillance videotapes and ATM receipts because they were not properly authenticated
pursuant to Texas Rule of Evidence 901(a). We do not reverse a ruling based on nonconstitutional
error that does not affect "substantial rights." (75) If, after examining the record as a whole, we
determine that any error had a slight or no effect on the jury, then we will not overturn the trial
court's ruling. (76) We have observed that "the presence of overwhelming evidence of guilt plays a
determinative role" in this analysis. (77) Assuming without deciding that the trial court erred in
admitting the surveillance videotapes or ATM receipts, such error was harmless in light of the
overwhelming evidence of guilt shown by other evidence detailed above in our analysis of the
sufficiency of the evidence under points of error eleven and twelve. Points of error twenty-four and
twenty-five are overruled. 

We affirm the judgment of the trial court.

Filed: June 18, 2008

Publish
1. Tex. Pen. Code § 19.03(a)(2)("A person commits an offense if the person commits murder
as defined under Section 19.02(b)(1) and . . . the person intentionally commits the murder in the
course of committing or attempting to commit kidnapping, burglary, robbery, [or] aggravated sexual
assault . . . .").
2. Art. 37.071, § 2(g). All Articles cited in this opinion refer to the Texas Code of Criminal
Procedure unless otherwise stated.
3. Art. 37.071, § 2(h).
4. 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002). 
5. Id. at 321. 
6. Id. at 317. 
7. Ex parte Briseño, 135 S.W.3d 1, 5 (Tex. Crim. App. 2004). 
8. Id. at 5-13. 
9. 536 U.S. at 317. 
10. 546 U.S. 6, 126 S. Ct. 7, 163 L. Ed. 2d 6 (2005). 
11. Id. at 7. 
12. Id. 
13. Tex. Const. art. II, § 1.
14. 135 S.W.3d at 4. 
15. See id.
16. See id.
17. Id.
18. Id. 
19. Roberts v. State, 220 S.W.3d 521, 534 (Tex. Crim. App. 2007); Threadgill v. State, 146
S.W.3d 654, 672 (Tex. Crim. App. 2004); see also Gallo v. State, 239 S.W.3d 757, 779-80 (Tex.
Crim. App. 2007); Rayford v. State, 125 S.W.3d 521, 534 (Tex. Crim. App. 2003). 
20. 531 U.S. 98, 121 S. Ct. 525, 148 L. Ed. 2d 388 (2000).
21. Roberts, 220 S.W.3d at 534; Threadgill, 146 S.W.3d at 671-72. 
22. Briseño, 135 S.W.3d at 8-9.
23. Ex parte Blue, 230 S.W.3d 151, 163 (Tex. Crim. App. 2007)(citing Briseño, 135 S.W.3d
at 7). 
24. Gallo, 239 S.W.3d at 769-70 (quoting Briseno, 135 S.W.3d at 8-9). 
25. Gallo, 239 S.W.3d at 770. 
26. Id. (quoting Meraz v. State, 785 S.W.2d 146, 155 (Tex. Crim. App. 1990)). 
27. Hall v. State, 160 S.W.3d 24, 40 (Tex. Crim. App. 2006).
28. Blue, 230 S.W.3d at 166.
29. Roberts v. State, 220 S.W.3d at 524 (citing Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim.
App. 2000)). 
30. Id. (citing Watson v. State, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006)).
31. Id. (citing Watson, 204 S.W.3d at 417). 
32. Art. 38.14. 
33. Id. 
34. Johnson v. State, 967 S.W.2d 410, 411 (Tex. Crim. App. 1998)(citing Gardner v. State,
699 S.W.2d 831, 835 (Tex.Crim.App. 1985)).
35. Gallo, 239 S.W.3d at 770. 
36. 178 S.W.3d 782 (Tex. Crim. App. 2005). 
37. Id. at 783.
38. Id. at 787.
39. Prystash v. State, 3 S.W.3d 522, 535 (Tex. Crim. App. 1999)("[B]ecause there are no
constitutional limits on the jury's discretion to consider mitigating evidence, the constitution does
not require a burden of proof."). 
40. Jackson v. State, 992 S.W.2d 469, 480-81 (Tex. Crim. App. 1999). 
41. Emphasis added.
42. Art. 36.19; Alamanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984). 
43. Alamanza, 686 S.W.2d at 171. 
44. See, e.g., Lawton v. State, 913 S.W.2d 542, 558 (Tex. Crim. App. 1995).
45. Tex. R. App. P. 33.1(a). 
46. Gillenwaters v. State, 205 S.W.3d 534, 537 (Tex. Crim. App. 2006)(citing Hollins v. State,
605 S.W.2d 475, 476 (Tex. Crim. App. 1991)). 
47. Id. (citing Lankston v. State, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)). 
48. Manns v. State, 122 S.W.3d 171 (Tex. Crim. App. 2003). 
49. Id. at 180 (citing Kuhlmann v. Wilson, 477 U.S. 436, 91 L. Ed. 2d 364, 106 S. Ct. 2616
(1986)).
50. Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).
51. Arizona v. Youngblood, 488 U.S. 51, 58, 109 S. Ct. 333, 337, 102 L. Ed. 2d 281, 289
(1988); Pena v. State, 191 S.W.3d 133, 134, 138 (Tex. Crim. App. 2006). 
52. Ford v. State, 158 S.W.3d 488, 492 (2005). 
53. Garcia v. State, 43 S.W.3d 527, 530 (Tex. Crim. App. 2001). 
54. Ford, 158 S.W.3d at 492; Garcia, 43 S.W.3d at 530. 
55. Parker v. State, 206 S.W.3d 593 (Tex. Crim. App. 2001)(citing Amores v. State, 816
S.W.2d 407, 413 (Tex. Crim. App. 1991); State v. Ballard, 987 S.W.2d 889, 892 (Tex. Crim. App.
1999)(citing New York v. Harris, 495 U.S. 14, 110 S. Ct. 1640, 109 L. Ed. 2d 13 (1990)). 
56. Article 14.04.
57. Hughes v. State, 24 S.W.2d 528, 531 (Tex. Crim. App. 2000). 
58. State v. Ballard, 987 S.W.2d 889, 892 (Tex. Crim. App. 1999)(citing Smith v. State, 739
S.W.2d 848, 851 (Tex. Crim App. 1987)).
59. Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). 
60. Torres v. State, 182 S.W.3d 899, 902 (Tex. Crim. App. 2005). 
61. Guzman, 955 S.W.2d at 89.
62. McGee v. State, 105 S.W.3d 609, 615 (Tex. Crim. App 2003)(citing Minnesota v.
Dickerson, 508 U.S. 366, 372, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993). 
63. Torres v. State, 182 S.W.3d 899, 902 (Tex. Crim. App. 2005). 
64. Id. 
65. Wiede v. State, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007).
66. Id. at 24 n.29 (citing Illinois v. Gates, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527
(1982)).
67. United States v. Ross, 456 U.S. 798, 825, 102 S. Ct. 2157, 72 L. Ed. 2d 572 (1982).
68. Maryland v. Dyson, 527 U.S. 465, 467, 119 S. Ct. 2013, 144 L. Ed. 2d 442 (1999); State
v. Guzman, 959 S.W.2d 631, 633 (Tex. Crim. App. 1998)("[A] vehicle lawfully in police custody
may be searched on the basis of probable cause to believe that it contains contraband, and there is
no requirement of exigent circumstances to justify such a warrantless search." (quoting United States
v. Johns, 469 U.S. 478, 484, 105 S. Ct. 881, 83 L. Ed. 2d 890 (1985))).
69. Gutierrez v. State, 221 S.W.3d 680 (Tex. Crim. App. 2007). 
70. Tex. R. App. P. 44.2(a). 
71. Jones v. State, 119 S.W.3d 766, 777 (Tex. Crim. App. 2003) (quoting McCarthy v. State,
65 S.W.3d 47, 55 (Tex. Crim. App. 2001), cert. denied, 536 U.S. 972, 153 L. Ed. 2d 862, 122 S. Ct.
2693 (2002)). 
72. McCarthy, 65 S.W.3d at 55.
73. McMahon v. State, 582 S.W.2d 786, 790 (Tex. Crim. App. 1978).
74. Fuller v. State, 829 S.W.2d 121, 202 (Tex. Crim. App. 1992).
75. Tex. R. App. P. 44.2(b). 
76. Morales v. State, 32 S.W.3d 862, 867 (quoting Johnson v. State, 967 S.W.2d 410, 417
(Tex. Crim. App. 1998)). 
77. Motilla v. State, 78 S.W.3d 352, 356 (Tex. Crim. App. 2002) (quoting Harris v. State, 790
S.W.2d 568, 587 (Tex. Crim. App. 1989)).